UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BASSAM A. ALIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16 CV 1353 JMB |
| | ) | |
| | ) | |
| NANCY A. BERRYHILL,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**[2]

Plaintiff Bassam A. Alie ("Plaintiff") appeals the decision of the Acting Commissioner of

Social Security ("Defendant") denying his applications for disability benefits under Title II of the

Social Security Act, see 42 U.S.C. §§ 401 et seq., and supplemental security income under Title

XVI, see 42 U.S.C. §§ 1381 et seq. Substantial evidence supports the Commissioner's decision,

and therefore it is affirmed. See 42 U.S.C. § 405(g).

**I.     Procedural History & Summary of Memorandum Decision**

On March 28, 2013, Plaintiff filed applications for disability benefits, arguing that his

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] This case is before the undersigned for judicial review pursuant to 42 U.S.C. § 405(g), with the consent of the parties under 28 U.S.C. § 636(c).

disability began on February 23, 2012, as a result of depression, anxiety, and Attention-Deficit/Hyperactivity Disorder ("ADHD"). (Tr. 138-44) On May15, 2013, Plaintiff's claims were denied upon initial consideration. (Tr. 78-82) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). Plaintiff appeared at the hearing (with counsel) on December 9, 2014, and testified concerning the nature of his disability, his functional limitations, and his past work. (Tr. 41-57) The ALJ propounded interrogatories to a vocational expert ("VE"). On March 16, 2015, the VE answered the ALJ's interrogatories about the nature of Plaintiff's past work,[3] and opined as to Plaintiff's ability to secure other work in the national economy, based upon his functional limitations, age, and education. (Tr. 307-16) After taking Plaintiff's testimony, considering the VE's interrogatory answers and the consultative examination by Dr. David Peaco, and after reviewing the rest of the evidence of record, the ALJ issued a decision on June 26, 2015, finding that Plaintiff was not disabled, and therefore denying Plaintiff's benefits. (Tr. 15-27)

Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social Security Administration. (Tr. 1-7) On June 24, 2016, the Appeals Council denied review of Plaintiff's claims, (Tr. 1-3), making the June 2015 decision of the ALJ the final decision of the Commissioner. Plaintiff has therefore exhausted his administrative remedies, and his appeal is properly before this Court. See 42 U.S.C. § 405(g).

The ALJ concluded that Plaintiff could not return to his past relevant work as a janitor or fork lift driver. (Tr. 25) Based on hypothetical questions posed to a VE, the ALJ found that Plaintiff was not under a disability within the meaning of the Act because he could perform

_____

[3] The VE identified Plaintiff's past work as a janitor, an order filler, a fork lift driver, and a material handler.

other work that existed in substantial numbers in the national economy, namely a bench assembler and a laundry worker. (Tr. 26)

In his initial brief to this Court, Plaintiff argued that: (1) the ALJ failed to properly weigh the medical opinion evidence, in particular, the opinion of Dr. Goldmeier; (2) the ALJ failed to address alleged conflicts between the Dictionary of Occupational Titles ("DOT") and the VE's testimony; and (3) the ALJ erred in adopting the VE's testimony. The Commissioner filed a detailed brief in opposition.

As explained below, the Court concludes that the ALJ did not err in weighing the medical opinion evidence and determining Plaintiff's RFC. Likewise, the ALJ properly adopted the VE's testimony.

## II.      **Plaintiff's Disability and Function Reports**

In his "Disability Report – Field Office," the interviewer noted that Plaintiff "did not appear to have any difficulty understanding or communicating during the interview." (Tr. 196) In his "Disability Report – Adult," Plaintiff indicated that he stopped working on October 15, 2012, because of his conditions, and he did not attend special education classes. (Tr. 199-200) Plaintiff's mother completed a "Function Report Adult – Third Party." (Tr. 208-15) His mother reported that Plaintiff spends his days looking for work and watching television. (Tr. 208)

## III.      **Medical Records**

The administrative record before this Court includes medical records indicating that Plaintiff received health treatment from two health care professionals at the Crider Health Center regarding his mental health symptoms. The Court has reviewed the entire record. The following is a summary of pertinent portions of the medical records relevant to the matters at issue in this case.

### A.  Drs. Muhammad Arain and David Goldmeier[4] - Crider Health Center
(Tr. 348-520)

Between January 26, 2012, and October 16, 2014, Drs. Muhammad Arain and David Goldmeier, both psychiatrists, treated Plaintiff at the Crider Health Center.  The treating records indicate that the visits were for psychiatric treatment and medication management.  In particular, Dr. Goldmeier treated Plaintiff starting on May 5, 2014, through October 16, 2014, a total of six times, and Dr. Arain treated Plaintiff starting on January 26, 2012, through March 13, 2014, a total of twenty-six times.

### 1.  Dr. Muhammad Arain

Between January 26, 2012, through March 13, 2014, Dr. Arain treated Plaintiff's mental health symptoms at the Crider Health Center.  On January 26, 2012, Dr. Arain completed an initial assessment for psychiatric treatment.  A mental status examination showed Plaintiff to be alert and oriented as to time, place, and person, his behavior appropriate and cooperative, his affect reactive, his thought process linear and logical, his intellectual functioning average, and his insight and judgment fair.  Dr. Arain assessed Plaintiff with major depressive disorder (recurrent moderate), Post-Traumatic Stress Disorder ("PTSD"), ADHD, and learning disorder (not otherwise specified).  Dr. Arain prescribed Wellbutrin, Xanax, and Trazodone.  In follow-up treatment on February 9 and March 22, 2012, Plaintiff reported that he was trying to find a job, struggling with social anxiety, and having learning problems.  Dr. Arain's mental status examinations had the same results as the first one, and he continued Plaintiff's medication regimen.

---

[4] As noted by the parties, the ALJ and Plaintiff spell Dr. Goldmeier's name as "Dr. Goldmeyer." A review of the record indicates that the correct spelling is most likely "Goldmeier." Accordingly, the undersigned will refer to the psychiatrist as Dr. Goldmeier in this Memorandum and Order.

Dr. Arain saw Plaintiff again on April 19, 2012.  Plaintiff reported everything was the same, and he would be going to Vocational Rehab and calling a temp agency.  A mental status examination showed Plaintiff was alert and oriented as to time, place, and person, his behavior appropriate and cooperative, his affect restricted, his thought process linear and logical, and his insight and judgment fair.  Dr. Arain noted no change to his diagnosis and continued Plaintiff's medication regimen and counseling.  Dr. Arain treated Plaintiff again on June 14, 2012.  Plaintiff reported his mood was good, and he had been interviewing for jobs.  Plaintiff noted that he has problems with focus, attention, and organization.  Dr. Arain changed Plaintiff's medication regimen by adding Ritalin.

Dr. Arain saw Plaintiff again on July 12 and August 9, 2012.  Plaintiff reported possibly being hired by a meat packing company, and his mood was good.  Mental status examinations showed Plaintiff was alert and oriented as to time, place, and person, his behavior appropriate and cooperative, his affect restricted, his thought process linear and logical, and his insight and judgment fair.  Dr. Arain changed Plaintiff's medication regimen by adding increasing the Ritalin dosage.

In follow-up treatment on September 6, 2012, Plaintiff reported having been on ten job interviews, and his mood was stable.  Dr. Arain's mental status examination had the same results as the previous ones, and he continued Plaintiff's medication regimen.  On October 4, November 1, and December 6, 2012, Plaintiff reported looking for a job.  Mental status examinations showed Plaintiff was alert and oriented as to time, place, and person, his behavior appropriate and cooperative, his affect reactive, his thought process linear and logical, and his insight and judgment fair.  Dr. Arain continued Plaintiff's medication regimen.

In a January 7, 2013, OP Individual Treatment Plan, Plaintiff indicated that his

medication regimen was helping his anxiety and depression. Plaintiff explained that when he does not take his medication; he has no motivation, lacks focus, and experiences more anxiety.

On January 7, 2013, Plaintiff received outpatient medication management for treatment of his major depressive disorder (recurrent, moderate), PTSD, ADHD, and learning disorder (not otherwise specified). Plaintiff reported feeling better and being stable, looking for a job, and having no medication side effects. A mental status examination showed Plaintiff to be oriented to person, place, and time, his recall and recent memory okay, his attention/concentration within normal limits, his mood/affect reactive, his thought process intact, and his judgment and insight fair. Active medications were reviewed by Dr. Arain and no changes were made. During outpatient medication management on February 4, 2013, Plaintiff reported receiving a forklift certification and possibly starting a job in landscaping. Plaintiff's mental examination showed the same results as the earlier ones. On March 4 and April 1, 2013, Plaintiff reported applying for jobs and having no medication side effects. Mental status examinations showed Plaintiff to be oriented to person, place, and time, his recall and recent memory okay, his attention/concentration within normal limits, his mood/affect reactive, his thought process intact, and his judgment and insight fair. Active medications were reviewed by Dr. Arain and no changes were made.

On April 29 and May 28, 2013, Plaintiff received outpatient medication management and reported feeling stable. Mental status examinations showed Plaintiff to be oriented to person, place, and time, his attention/concentration within normal limits, his mood/affect reactive, his thought process intact, and his judgment and insight fair. Active medications were reviewed by Dr. Arain and no changes were made. In follow up outpatient medication management on June 25, 2013, Plaintiff reported feeling stable and looking for a job. Plaintiff received outpatient

medication management on July 23, 2013.  A mental status examination showed Plaintiff to be oriented to person, place, and time, his attention/concentration within normal limits, his mood/affect reactive and restricted his thought process intact, and his judgment and insight fair. Active medications were reviewed by Dr. Arain and no changes were made.

On August 20, 2013, Plaintiff received outpatient medication management.  Plaintiff reported looking for a job and experiencing no medication side effects.  A mental status examination showed Plaintiff to be oriented to person, place, and time, his attention/concentration within normal limits, his mood/affect full, his thought process intact, and his judgment and insight fair.  In follow-up outpatient medication management on September 17 and November 14, 2013, Plaintiff reported working at a restaurant as a dishwasher.  Mental status examinations showed Plaintiff to be oriented to person, place, and time, his attention/concentration within normal limits, his mood/affect reactive, his thought process intact, and his judgment and insight fair.  Active medications were reviewed by Dr. Arain and no changes were made.  During outpatient medication management on December 12, 2013, Dr. Arain noted Plaintiff's diagnosis to be stable.  Plaintiff reported feeling better, being stable, and working part time.  A mental status examination showed Plaintiff to be oriented to person, place, and time, his attention/concentration within normal limits, his mood/affect full, his thought process intact, and his judgment and insight fair.

On January 16 and February 13, 2014, Plaintiff received outpatient medication management.  Plaintiff reported taking night classes for certification as a technician and working. Mental status examinations showed Plaintiff to be oriented to person, place, and time, his attention/concentration within normal limits, his mood/affect full, his thought process intact, and his judgment and insight fair.  Dr. Arain continued Plaintiff's medication regimen.  In follow-up

outpatient medication management on March 13, 2014, Dr. Arain continued Plaintiff's medications. A mental status examination showed Plaintiff to be oriented to person, place, and time, his attention/concentration within normal limits, his mood/affect full, his thought process intact, and his judgment and insight fair.

## 2. **Dr. David Goldmeier** (Tr. 478-520)

Dr. Goldmeier treated Plaintiff six times between May 5, 2014, and through October 16, 2014. The records indicate that the visits included one psychiatric evaluation and five fifteen-minute medication management sessions.

In a May 5, 2014, Psychiatric Evaluation Note, Plaintiff reported that his concentration was good, and his interest fair. Plaintiff indicated that he has some financial stress and was looking for better paying jobs. Dr. Goldmeier observed Plaintiff to be anxious, his mood depressed, and his insight and judgment were fair.

In a May, 2014, Personal Development Plan "Plan, completed by Diane Brody, a medical assistant, Plaintiff indicated that he felt better on his medications and he was working. Plaintiff explained that "[b]efore I didn't want to see or talk to people, but the medicine started working and I talked to (clinicians) and now it is easier." (Tr. 478) Dr. Goldmeier reviewed and signed the Plan on June 4, 2014.

A outpatient medication management on June 2, 2013, Plaintiff reported starting a dishwashing and prep work job at a restaurant and the severity of his symptoms as mild. A mental status examination showed Plaintiff to be oriented to person, place, and time, okay recent and remote memory, his attention/concentration within normal limits, his mood/affect full, his thought process concrete, and his judgment and insight fair. Dr. Goldmeier found Plaintiff had a mild exacerbation of his major depressive disorder, PSTD, ADHD, and learning disorder. Dr.

Goldmeier added Adderall to Plaintiff's medication regimen.  In follow-up treatment on July 2, 2014, Plaintiff reported doing "very good," and working thirty hours weekly at a restaurant as a dishwasher, and possibly looking for a second job.  Plaintiff indicated that his concentration was okay and his symptoms were mild.  A mental status examination showed Plaintiff to be oriented to person, place, and time, his attention/concentration within normal limits, ok recent and remote memory, his mood/affect full, his thought process intact, and his judgment and insight fair.  Dr. Goldmeier decreased Plaintiff's Xanax dosage.

At medication management on July 30, 2014, Plaintiff reported "[e]verything is good, still working."  (Tr. 498)  A mental examination showed the same results as the previous one, and Dr. Goldmeier continued Plaintiff's medication regimen.  In follow-up medication management on September 4, 2014, Plaintiff indicated that work had been going well.  A mental status examination showed Plaintiff to be oriented to person, place, and time, his attention/concentration within normal limits, okay recent and remote memory, his mood/affect full, his thought process intact, and his judgment and insight fair.  Dr. Goldmeier adjusted Plaintiff's medication regimen by decreasing his dosage of Xanax.

On October 16, 2014, Plaintiff again received outpatient medication management treatment.  Plaintiff reported being scheduled more hours at work but considering changing jobs to "more challenging work."  (Tr. 487)  A mental status examination showed Plaintiff to be oriented to person, place, and time, his attention/concentration impaired, okay recent and remote memory, his mood/affect full, his thought process intact, and his judgment and insight fair.  Dr. Goldmeier adjusted Plaintiff's medication regimen by increasing his Adderall dosage.

On December15, 2014, Dr. Goldmeier completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) ("MA") in a checklist format and answered questions

regarding Plaintiff's impairments at the behest of counsel.  Dr. Goldmeier indicated that he treated Plaintiff every four weeks and that his diagnoses included depression, ADHD, and PTSD. Dr. Goldmeier opined that Plaintiff would have difficulty working a full-time job on a sustained basis, because he reported struggling to keep up with his part-time work as a dishwasher.  Dr. Goldmeier identified poor memory, mood disturbance, emotional lability, loss of intellectual ability, recurrent panic attacks, difficulty thinking or concentrating, difficulty with interpersonal relations, social withdrawal or isolation, blunt, flat or inappropriate affect, intrusive recollections of a traumatic experience, and generalized, persistent anxiety as Plaintiff's symptoms.   Dr. Goldmeier opined that Plaintiff would be off task more than 20% during an eight hour work day; he would have to receive redirection one to two times during the workday; and he would miss work once a month.  Dr. Goldmeier found Plaintiff had marked functional limitations as result of his mental impairments in activities of daily living, in maintaining social functioning, in attention and concentration, in understanding and carrying out detailed instructions.

> **B.**     **Psychological Evaluation – Dr. David Peaco** (Tr. 523-31)

On January 9, 2015, Dr. David Peaco, Ph.D. and a licensed psychologist, administered IQ testing and conducted a consultative psychological evaluation of Plaintiff, which included a review of his mental health records.   Plaintiff admitted working twenty hours a week for the last seven months as a dishwasher.  Dr. Peaco found Plaintiff's flow of thinking was normal, his affect was restricted, his mood was depressed, and his orientation was intact.  Dr. Peaco noted that, although Plaintiff reported having problems remembering instructions and having poor concentration, when asked to remember three words for ten minutes as the interview continued, he was able to remember all three words.  Dr. Peaco found Plaintiff's persistence in completing tasks was moderately impaired, and his concentration was markedly impaired.

Dr. Peaco opined that Plaintiff put forth his best effort in answering the test questions. Based on the WAIS-IV test, Dr. Peaco found Plaintiff's overall level of intellectual functioning was in the borderline range, with a full scale IQ score of 70. Dr. Peaco listed major depression, recurrent/mild/generalized anxiety, borderline intellectual functioning, and moderate stresses due to financial problems in his diagnostic impressions. Dr. Peaco determined that Plaintiff was able to understand and briefly remember all simple instructions but he would have problems sometimes remembering simple instructions for longer period of times. Dr. Peaco also found that Plaintiff's persistence in completing tasks and intellectual functioning were moderately impaired, and his concentration and social functioning were moderately impaired.

In a Medical Source Statement of Ability to Do Work-Related Activities (Mental) ("MSS"), Dr. Paeco opined that Plaintiff was markedly limited in his ability to make judgments on complex work-related decisions and to carry out complex instructions.

**C.** **Psychological Consulatation – Dr. Marsha Toll, Psy.D.** (Tr. 67-75)

Dr. Marsha Toll, Psy.D., a state agency psychological consultant, opined that Plaintiff was moderately limited in his ability to understand and remember detailed instructions, but he was not significantly limited in his ability to remember very short and simple instructions. Dr. Toll also opined that Plaintiff was not significantly limited in either his ability to make simple work-related decisions or his ability to accept instructions and respond appropriately to criticism from supervisors.

**IV.** **The Hearing Before the ALJ and VE Interrogatory Answers**

The ALJ conducted a hearing on December 9, 2014. Plaintiff was present with an attorney and testified at the hearing.

### A.    __Plaintiff's Testimony__

Plaintiff began his testimony by noting that he has a driver's license and a GED. (Tr. 41-42) Plaintiff attended regular classes but he was sent to the resource room for assistance. (Tr. 52)

Plaintiff acknowledged that he had been working as a dishwasher, four days a week for twenty to twenty five hours since June 2014, which was his alleged onset date.[5] (Tr. 42) Plaintiff admitted that he did not have any physical problems that preclude him from working. (Tr. 48) Plaintiff reported problems sleeping due to his racing thoughts and that he takes medications. (Tr. 50-51) Plaintiff experiences anxiety attacks resulting in stuttering triggered by talking to other people. (Tr. 52, 54) Plaintiff admitted that his daily activities have, at times, included staying at home and working. (Tr. 48) Plaintiff reported having problems reading, concentrating, and interacting with other people. (Tr. 49, 51-52)

Plaintiff's counsel requested a psychological evaluation and IQ testing. (Tr. 55) The ALJ left the record open so that counsel could submit Plaintiff's school records and a psychological consultative evaluation, including IQ testing, could be completed. (Tr. 56-57)

### B.    __The VE's Opinion by Interrogatory Answers__

In lieu of a VE's live testimony at the hearing, the ALJ submitted interrogatories to VE Dale Thomas. Asked to classify jobs Plaintiff had performed in the past fifteen years in terms of their exertional and skill requirements, Mr. Thomas responded that Plaintiff's jobs as a janitor and a forklift driver were at the medium exertional level with SVP 3; his job as an order filler was at the medium exertional level but performed at the light exertional level with SVP 2; and

---

[5] Plaintiff also had prior work as a dishwasher loader, a launderer, and an office cleaner. (Tr. 44-46)

his job as a material handler was at the heavy exertional level but performed at medium

exertional level with SVP 3.  (Tr. 313)

The interrogatories included the following hypothetical question, which incorporated the

limitations described in the ALJ's determination of Plaintiff's RFC:

> Assume a hypothetical individual who was born on May 18, 1977, has at least a
> high school education and is able to communicate in English … and has work
> experience as described in your response [regarding Plaintiff's past relevant work].
> Assume further that this individual has the residual functional capacity (RFC) to
> perform a full range of work at all exertional levels but with the following
> nonexertional limitations:  he can understand, remember and carry out simple
> instructions.  He can have occasional interaction with supervisors and co-workers,
> and only incidental interaction with the public.  He can make only tolerate
> occasional change in work location.  He can only make simple, work-related
> decisions.

(Tr. 314)  The VE determined that such a person would be able to perform Plaintiff's past work

as an order filler, 382.664-010, a SVP of 2, medium exertional level, and opined that there were

no conflicts between the occupational evidence and the DOT.  (Tr. 314-15).  The VE further

responded that this hypothetical person would be able to perform work as a bench assembler,

(DOT 706,684-042), and a laundry worker, (DOT 302.685-010), both at SVP level 2.  (Tr. 315)

Notably, the interrogatory form submitted to the VE contained several questions with check

boxes next to them, one being, "Are there any conflicts between the occupational evidence you

have provided… and the occupational information contained in the DTO and/or the SCO [that is,

the Selected Characteristics of Occupations ("SCO"), a companion volume to the DOT]?"  (Tr.

316)  The VE placed a check next to "No" to the question.  (Id.)

On March 26, 2015, the ALJ sent Mr. Thomas' interrogatory answers to Plaintiff's

counsel and informed him that counsel could submit additional evidence to the VE, submit legal

argument, or provide written questions to the expert.  (Tr. 318-19)  The ALJ advised Plaintiff's

counsel that if she did not hear from him in ten days, she would assume that he did not wish to

request a supplemental hearing, to submit any written statements or records, or to question the VE. (Tr. 319)  In an April 8, 2015, letter, counsel argued that the VE's testimony conflicted with the DOT. (Tr. 321)  Specifically, counsel argued that there was an inconsistency between the hypothetical question, which included a limitation to understanding, remembering, and carrying out simple instructions and making simple, work-related decisions and the DOT which described the jobs identified by the VE as requiring level 2 reasoning.  (Id.)  Plaintiff also asserted that the school evidence and the medical evidence establish the Plaintiff meets or equals Listing 12.05(C).[6]

## V.    The ALJ's Decision

In a decision dated June 26, 2015, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  (Tr. 15-27)  Consistent with the VE's testimony, the ALJ found that Plaintiff had the residual functional capacity to perform the requirements of occupations such as bench assembler and laundry worker.  (Tr. 26)

In arriving at her decision, the ALJ followed the required five-step inquiry.  The ALJ found that Plaintiff has not engaged in substantial gainful activity since February 23, 2012, the alleged date of disability.  (Tr. 17)  The ALJ determined that Plaintiff has the severe impairments

---

[6] In this case, Plaintiff waived his listing argument during the administrative hearing when his attorney conceded on the record that none of the listings were met.  (Tr. 41)  See Watson v. Barnhart, 194 Fed. Appx. 526, 529 (10th Cir. 2006) (finding no error where the claimant's counsel had conceded that the claimant was not arguing that her condition met or equaled a listed impairment, and ALJ therefore did not analyze whether claimant's impairments met a listing); see also Gloth v. Astrue, 2009 WL 3837471 (W.D. Mo. 2009) (same); cf. Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) ("[A]n ALJ is not obliged to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.") (internal quotations omitted).  It is important to enforce such waivers.  To allow a claimant to administratively disavow an argument and then raise the disavowed argument before a district court would permit claimants an unjustified second bite at the apple and thwart the administrative process.

of major depression, anxiety, PTSD, borderline intellectual function, and learning disability.

(Id.) The ALJ further determined that, despite his impairments, Plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following additional limitations/restrictions: (1) Plaintiff "can understand, remember and carry out simple instructions;" (2) Plaintiff "can have occasional interaction with supervisors and co-workers, and only incidental interaction with the public;" (3) Plaintiff "can make only tolerate occasional change in work location;" and (4) Plaintiff "can only make simple, work-related decisions." (Tr. 20)

The ALJ supported her RFC determination with a thorough analysis of the record evidence. (Tr. 20-25) The ALJ considered Plaintiff's educational record which showed Plaintiff was assessed as learning disabled in the area of written expression and given an Individualized Educational Plan for the tenth grade in 1995. (Tr. 21) The ALJ noted that Plaintiff's school records show in August 1990, Plaintiff took the Wechsler Adult Intelligence Scale ("WAIS") for Children and achieved a full scale IQ of 83, and in 1993, a full scale score of 77. (Tr. 23) The ALJ noted that Plaintiff's school records show a recommendation of placement into resource special education services. (Tr. 21) The ALJ also noted that the August 2011 records from the Missouri Department of Corrections showed Plaintiff achieved an extremely low score based on the WAIS Third Edition IQ test and the Kaufman Brief IQ test.

The ALJ next considered Plaintiff's subjective allegations regarding his symptoms and limitations, but found him not entirely credible. (Tr. 21, 23-24) The ALJ thoroughly considered the record evidence regarding Plaintiff's non-exertional limitations, including his mental health problems. The ALJ noted that one of the persons providing mental health treatment to Plaintiff was Dr. Muhammad Arain, a psychiatrist, and he treated Plaintiff on a monthly basis between

February 2013 and September 2014, and consistently noted that Plaintiff's symptoms were stable and found him to be oriented as to person, place, and time. (Tr. 21-24) The ALJ further noted that based on mental status examinations, Dr. Arian found that Plaintiff's concentration/attention was within normal limits. (Tr. 24) The ALJ further explained how the opinions of Dr. David Goldmeier were "largely not consistent with the bulk of the evidence in the record." (Id.) The ALJ also considered Plaintiff's hearing testimony regarding his part-time work three to four days a week, a total of twenty to twenty five hours a week, as another reason for not finding Plaintiff entirely credible.

The ALJ also observed that Plaintiff was "aware that the intelligence test he took in January 2015 was for purpose of obtaining disability benefits and that the tests of [Plaintiff's] intelligence were performed in an educational setting and are more indicative of [Plaintiff's] actual intelligence." (Tr. 23) For example, during the consultative examination, Dr. David Peaco administered the Wechsler Adult Intelligence Scale and determined that Plaintiff has a full-scale IQ of 70, but earlier IQ testing performed in an educational setting showed Plaintiff's IQ to be 83 and 77. (Tr. 23) For these reasons, the ALJ gave Dr. Peaco's opinions little weight.

After examining the medical evidence, the ALJ explained that, other than Dr. Peaco, the other examining physicians "found [Plaintiff] was oriented and his thought process was intact and his thought content was within limits." (Tr. 25) The ALJ further accorded Dr. Peaco's opinions little weight inasmuch as his opinions were "not generally consistent with the bulk of the evidence in the longitudinal file." (Id.)

The ALJ concluded that, although Plaintiff could not return to his past relevant work as a janitor or a fork list driver, he could perform other jobs that exist in substantial numbers in the state and national economies. (Tr. 25-26) In making her determinations, the ALJ relied on the

interrogatory answers of the VE.  The ALJ concluded that Plaintiff had the ability to perform the requirements of at least two representative jobs – bench assembler and laundry worker. Accordingly, the ALJ concluded that Plaintiff was not under a disability under the Act.  (Tr. 27)

The ALJ's decision is discussed in greater detail below in the context of the issues Plaintiff has raised in this matter.

## VI.    Standard of Review and Legal Framework

"To be eligible for SSI benefits, [Plaintiff] must prove that [he] is disabled …."  Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); see also Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A plaintiff will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled….  The ALJ consider[s] whether:  (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work."  Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)).

See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole. See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id. Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1. The credibility findings made by the ALJ.
2. The claimant's vocational factors.
3. The medical evidence from treating and consulting physicians.
4. The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.
5. Any corroboration by third parties of the claimant's impairments.
6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the

available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

**VII.**    **Analysis of Issues Presented**[7]

In his initial brief to this Court, Plaintiff argues that:  (1) the ALJ failed to properly weigh the medical opinion evidence, in particular, the opinion of Dr. Goldmeier; (2) the ALJ failed to address the conflicts between the DOT and the VE's testimony; and (3) the ALJ erred in adopting the VE's testimony.  The Court addresses each of Plaintiff's proffered issues below.

**A.**    **Weight Given to Medical Opinion Evidence**

Plaintiff argues that the ALJ failed to properly weigh the medical opinion evidence by not fully considering the factors governing treating physicians set forth in 20 C.F.R. §§ 404.1527, 416.927.  Plaintiff contends that Dr. Goldmeier was his treating psychiatrist, with a long and

---

[7] Plaintiff does not challenge the ALJ's adverse credibility finding in his Briefs.  Moreover, the undersigned finds the ALJ complied with the strictures of Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), and there is substantial evidence in the record to support the ALJ's analysis of Plaintiff's credibility.  A review of the ALJ's decision shows she partially discredited Plaintiff's subjective complaints for good reason and thoroughly discussed the objective findings of the mental health professionals, his conservative treatment, see Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (conservative treatment supported the ALJ's adverse credibility determination); his work activity during the alleged period of disability, and inconsistencies in the record, in support of her adverse credibility determination.  See Julin v. Colvin, 826 F.3d 1082, 1086 (8th Cir. 2016) (explaining that "[c]redibility determinations are the province of the ALJ" and the deference owed to such determinations); Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility determination").

extensive treatment history consisting of examinations every four weeks, and the ALJ accorded

his opinions little weight without offering sufficient reason.  The Court disagrees with this

characterization of the ALJ's decision.

As an initial matter, although he is described as Plaintiff's treating physician, Dr.

Goldmeier treated Plaintiff a total of six times between May 5 and October 16, 2014, one psych

evaluation and five medication management sessions.  See 20 C.F.R. § 404.1527(c)(2)(i)

("Generally, the longer a treated source has treated [a claimant] and the more times [a claimant]

has been seen by a treating source, the more weight [the ALJ] will give to the source's medical

opinion.").  In comparison, Dr. Arain treated Plaintiff a total of twenty-six times between

January 26, 2012, and March 13, 2014, including fifteen medication management sessions and

eleven office visits.

Regarding his mental impairments, Plaintiff received routine[8] and conservative treatment,

including outpatient medication management and routine counseling.  See Robinson v. Sullivan,

956 F.2d 936, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of

---

[8] The undersigned finds that there is substantial evidence in the record as a whole to support a finding that Plaintiff's treatment was routine.  Plaintiff received treatment for his mental impairments at the Crider Health Center, first from Dr. Arain and then from Dr. Goldmeier. Plaintiff's medical records show his mental health providers were able to find combinations of medications that adequately controlled his symptoms, and Plaintiff reported the same during treatment.  Given that Plaintiff's treatment did not involve more aggressive treatment than outpatient appointments with a psychiatrist and outpatient medication management, and that the prescription medications were helpful in managing his symptoms, the undersigned finds the characterization of Plaintiff's course of treatment as routine is appropriate.  See Lark v. Colvin, 2013 WL 1345273, at *11 (S.D. Tx. April 1, 2013) (discussing how brief psychiatric care, with improving symptoms, was routine and conservative care); Wise v. Astrue, 2012 WL 3156763, at *5, 7 (W.D. Mo. Aug. 2, 2012) (discussing how only outpatient visits for psychiatric care was routine); Brown v. Astrue, 2012 WL 886879, at *9, 14 (E.D. Mo. Mar. 15, 2012) (upholding ALJ's determination that treatment was conservative and routine where claimant was diagnosed with depression, anxiety, and PTSD, received counseling services and medication, and had essentially mild-to-normal examinations).

disabling pain).  The medical record shows Plaintiff routinely received normal mental status examinations during his treatment with Drs. Arain and Goldmeier.

In contrast, Dr. Goldmeier's MA – completed two months after his last outpatient medication management treatment and in a checklist format – concluded that Plaintiff had either moderate or marked limitations[9] in almost every area of functioning.  See Julin v. Colvin, 826 F.3d 1082, 1089 (8th Cir. 2016) (treating physician's conclusory opinion entitled to less weight). Dr. Goldmeier's MA purportedly covered the period from May 5, 2014, to October16, 2014, but he opined that Plaintiff's impairments were expected to last at least twelve months.

 "A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Reece v. Colvin, 834 F.3d 904, 908-09 (8th Cir. 2016) (internal quotations omitted). "Although a treating physician's opinion is usually entitled to great weight, it 'do[es] not automatically control, since the record must be evaluated as a whole.'"  Id. (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)).  "A treating physician's own inconsistency may undermine his opinion and diminish or eliminate the weight given his opinions."  Milam v. Colvin, 794 F.3d 978, 983 (8th Cir. 2015) (internal quotations omitted).  "Whether the ALJ gives the opinion of a treating physician great or little weight, the ALJ must give good reasons for doing so."  Prosch, 201 F.3d at 1013 (citing 20 C.F.R. § 404.1527(d)(2)).

The Court finds that the ALJ gave proper weight to the opinions of Dr. Goldmeier set

_____

[9] According to the MA form, an individual has a "moderate" limitation when "the individual is still able function satisfactorily."  An individual has an "extreme" limitation when he has "no useful ability to function in this area."

forth in the MA and the questions answered.[10] The ALJ afforded Dr. Goldmeier's opinions

"little weight because his conclusions are largely not consistent with the bulk of the evidence in

the record." (Tr. 24) In assigning little weight to Dr. Goldmeier's MA, the ALJ reasonably

concluded that the MA was inconsistent with the objective medical evidence. Cruze v. Chater,

85 F.3d 1320, 1325 (8th Cir. 1996) (treating source's opinions assigned less weight when the

"opinions have largely been inconsistent and are not fully supported by the objective medical

evidence). "[O]ther evidence in the record also supports the ALJ's decision not to accord [Dr.

Goldmeier's] opinion controlling weight." Reece v. Colvin, 834 F.3d 904, 910 (8th Cir. 2016).

Specifically, the ALJ noted that Dr. Muhammad Arain, another psychiatrist at the Crider Health

Center, treated Plaintiff's mental symptoms from March 2013 through March 2014, and his

mental status examinations consistently showed Plaintiff was oriented to person, place, and time;

his thought process was intact and his thought content was within normal limits; and his

concentration/attention was within normal limits. Further, Plaintiff reported looking for work,

receiving a fork lift certification, being stable, and feeling better during treatment with Dr. Arain.

Significantly, as reflected in his own treatment records, Dr. Goldmeier never imposed any mental

functional limitations or work restrictions on Plaintiff, and he routinely received normal mental

status examinations.

      Accordingly, the ALJ was justified in giving less than controlling weight to the

---

[10] The undersigned also notes that there was no treatment note of a visit the day Dr. Goldmeier completed the MA, and the MA was only a series of check marks to assess the mental limitations of Plaintiff with little or no explanation of the findings. A checklist format and conclusory opinions, even of a treating physician, are of limited evidentiary value. See Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010); Holmstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The checklist format, generally, and incompleteness of the [RFC] assessments limit their evidentiary value."). Further, the MA appears to have been procured by, and submitted to, Plaintiff's counsel. The MA does not refer to any clinical tests or findings, and was inconsistent with Dr. Goldmeier's prior treatment notes.

conclusory opinions set forth in Dr. Goldmeier's MA.  The ALJ properly offered a sufficient basis to give Dr. Goldmeier's opinions in the MA little weight.  See Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (finding error when the ALJ offered no basis to give an opinion non-substantial weight; "For example, the ALJ did not find the opinion inconsistent with the record or another [of the physician's own] opinion[s].").  Although the ALJ did not specifically address all of the non-controlling factors set forth in 20 C.F.R. §§ 404.1527(c), 416.927(c), the ALJ is not required to cite specifically to the regulations but need only clarify whether she discounted the opinion and why.  Kientzy v. Colvin, 2016 WL 4011322, at *8 (E.D. Mo. July 27, 2016).  In her decision, the ALJ outlined the treatment records from both Drs. Arain and Goldmeier which did not support the marked functional limitations in Dr. Goldmeier's MA.  In the instant case, the ALJ sufficiently explained her reasons for giving Dr. Goldmeier's marked functional limitations in the MA little weight as inconsistencies between the bulk of the evidence.  As outlined above, the medical evidence does not support the marked functional limitations in the MA.

The ALJ also reviewed the other mental health opinion evidence of record.  To the extent Plaintiff asserts the ALJ's analysis is flawed by her reliance on other opinions of record, it is the ALJ's function to resolve conflicts among differing medical opinions.  See Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).  In this case, the ALJ gave the opinions of Dr. Peaco, a licensed psychologist who completed a consultative examination, little weight "because his conclusions are not generally consistent with the bulk of the evidence in the longitudinal file.  The bulk of the evidence shows that the examining doctors found [Plaintiff] was oriented and his thought process was intact and his thought content was within limits."  (Tr. 25).  The ALJ gave the opinions of Dr. Marsha Toll, Psy.D., a state agency psychological consultant, significant weight "because Dr. Toll is an accepted medical source who reviewed the medical evidence in

the record and supported her conclusions with a detailed narrative report." (Id.)  The Court finds

that the ALJ properly considered the opinions of Dr. Toll.  As a state agency psychological

consultant, Dr. Toll is a highly qualified expert in Social Security disability evaluation.  20

C.F.R.  §§ 404.1527(f)(2)(i), 416.927(f)(2)(i); Kamann v. Colvin, 721 F.3d 945, 951 (8th Cir.

2013) (finding the ALJ did not err in considering state agency psychologist's opinion along with

the medical evidence as a whole).

The undersigned also notes that the medical record shows that Plaintiff has not required

aggressive care and his providers have not recommended such care.  Overall, the evidence shows

that Plaintiff has had routine and conservative mental health treatment limited for the most part

to outpatient medication management.  In fact, the evidence shows Plaintiff's mental symptoms

improved with conservative mental health treatment.  Viewing the ALJ's opinion in light of the

record as a whole, substantial evidence supports the ALJ's decision to assign little weight to Dr.

Goldmeier's opinions.  See Prosch, 201 F.3d at 1013 (internal inconsistency and conflict with

other evidence on the record constitute good reasons to assign lesser weight to a treating

physician's opinion).

**B.** **Conflicts Between the VE's Testimony and the DOT**

Plaintiff next contends that a conflict regarding the VE's testimony undermines the ALJ's

decision.  In particular, Plaintiff argues that there was an inconsistency between the hypothetical

question posed to the VE, which included a limitation to understanding, remembering, and

carrying out simple instructions and making simple, work-related decisions, and the Dictionary

of Occupational Titles ("DOT"), which described both of the jobs identified by the VE as

requiring level 2 reasoning.

It is well established that the DOT describes the upper limits of skills for all jobs in a

given occupational category.  DOT definitions are "simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range."  Page v. Astrue, 484 F.3d 1040, 1045 (8th Cir. 2007).  Its descriptions are not meant to be read as requirements of every job within a category.  Id.

The Eighth Circuit has previously rejected similar arguments.  In Moore v. Astrue, 623 F.3d 599, 604 (8th Cir. 2010), the Eighth Circuit held that a hypothetical stating that a claimant was capable of "carrying out simple job instructions" and performing "simple, routine and repetitive work activity at the unskilled task level" was not inconsistent with the VE's opinion that the claimant could perform jobs with a reasoning level of two.  Id.  The Eighth Circuit explained:

> [T]he ALJ did not limit "simple" job instructions to "simple *one- or two-step* instructions" or otherwise indicate that [the claimant] could perform only occupations at a DOT Level 1 reasoning level.  Indeed, the Level 2 reasoning definition refers to "detailed but *uninvolved*" instructions.  DOT at 1011 (emphasis added).  The dictionary defines "uninvolved" as "not involved," and in turn defines "involved" as complicated, intricate."  Webster's Third New Int'l Dictionary 1191, 2499 (2002).  There is no direct conflict between "carrying out simple job instructions" for "simple, routine and repetitive work activity," as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate.

> Moreover, the Listing 2 reasoning definition is an upper limit across all jobs in the occupational category, not a requirement of every job within the category.  "[A] claimant's reliance on the DOT as a definitive authority on job requirements is misplaced because DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range."  *Page [v. Astrue]*, 484 F.3d [1040], 1045 [(8th 2007)] (internal quotations marks omitted).  "The DOT itself cautions that its descriptions may not coincide in every respect with the content of jobs as performed in particular establishments or at certain localities."  *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000); see DOT at xiii.  "In other words, not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT."  *Wheeler*, 224 F.3d at 897.  There is nothing in the record to suggest that the vocational expert ignored the reasoning limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs.  *See Whitehouse v. Sullivan*, 940 F.2d

> 1005, 1006 (8th Cir. 1991) ("[T]he ALJ could properly assume that the expert framed his answers based on the factors the ALJ told him to take into account."). Because substantial evidence supports the ALJ's phrasing of the hypothetical to the vocational expert, and there was no conflict between the vocational expert's testimony and the DOT, the ALJ properly relied on the testimony. *See Page*, 484 F.3d at 1045.

Id. at 604-05.  See also Floyd v. Astrue, 2011 WL 864862, at *16 (E.D. Mo. March 11, 2011) (rejecting the argument that jobs with reasoning level two were inconsistent with a hypothetical describing a person who could understand, remember, and carry out simple instructions and detailed tasks) (citing Moore, 623 F.3d at 604).

Here, Plaintiff does not challenge the hypothetical posed to the VE, and the ALJ questioned the VE whether there were any inconsistencies between his interrogatory answers and the relevant DOT job descriptions.  The ALJ explained in her decision that the answers were consistent with the DOT and credited the VE's testimony.  Plaintiff's counsel was given the opportunity to submit questions about any apparent inconsistencies between the VE's interrogatory answers and the DOT, and he raised this claimed inconsistency.  On this record, and in accordance with Eighth Circuit precedent that an ability to follow simple instructions and perform non-detailed tasks is not inconsistent with level 2 reasoning, there is no need to remand this matter to the Commissioner for resolution of any perceived conflict.  See Welsh v. Colvin, 765 F.3d 926, 930 (8th Cir. 2014).

The ALJ did not limit simple job instructions to those requiring one or two step instructions, nor did she otherwise indicate that Plaintiff could perform only occupations at a DOT Level 1 reasoning level.  Additionally, the VE expressly indicated that there were no conflicts between the interrogatory answers he provided and the occupational information in the

DOT.  (Tr.  316)  Thus, with regard to the jobs of bench assembler and laundry worker,[11] the undersigned finds no inconsistency between the VE's evidence and the DOT.

###   C.   VE's Testimony

Plaintiff finally contends that that the ALJ's finding at step five was not supported by substantial evidence, because the ALJ erred in adopting the VE's testimony as it extended beyond the DOT with no reliable basis.  In particular, Plaintiff argues that a number of the limitations included in the hypothetical question were in areas not covered by the DOT, and the ALJ erred when she failed to resolve these conflicts between the VE testimony and the DOT. Specifically, Plaintiff notes that the following work-related impairments are not contained within the DOT:  occasional interaction with supervisors and co-workers; only incidental interaction with the public; and only occasional change in work location.  (Tr. 314)  Plaintiff argues that because the VE testified to information beyond the DOT, the ALJ must articulate findings providing a basis for relying on the VE's testimony regardless of whether the testimony is in conflict with the DOT or does not have the DOT as a reliable basis.

At step five of the ALJ's analysis, the ALJ may rely on the testimony of a vocational expert.  20 C.F.R. § 404.1566C.  Vocational expert testimony should generally be consistent with the DOT.  See Policy Interpretation Ruling: Titles II & XVI: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Information in Disability Decisions, SSR 00-4P (S.S.A. Dec. 4, 2000).  When conflicts arise, the ALJ must resolve

---

[11] As noted by Plaintiff, the ALJ cited to the wrong DOT code for laundry worker in her written decision.  This error, however, is harmless because Plaintiff has not shown the ALJ would have reached a different decision.  See Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (harmless error can be applied to an ALJ's decision); Byes v. Astrue, 687 F.3d 913, 917-18 (8th Cir. 2012) (to show that an error was not harmless, a claimant must provide some indication that the ALJ would have decided the case differently if the error had not occurred).  The ALJ's citing of the wrong DOT code was a simple mistake and not outcome determinative.

conflicts between the testimony and the DOT "by determining if the explanation given by the [VE] is reasonable and provides a basis for relying on the [VE] testimony rather than on the DOT information." Id. The failure to make sufficient inquiry to determine whether a conflict exists between vocational expert testimony and the DOT, and to resolve any conflict precludes an ALJ from relying on vocational expert testimony to find a claimant not disabled. See Kemp ex rel. Kemp v. Colvin, 743 F.3d 630, 633 (8th Cir. 2014). For the following reasons, the ALJ satisfied her duty here and did not err.

This Court has previously held that there must be an apparent and actual inconsistency between the DOT and the VE's testimony before triggering the additional development requirements of Social Security Ruling 00-04p. SSR-00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). This Court opined in Latragna v. Colvin, 2015 WL 4771630 (E.D. Mo. Aug. 12, 2015), as follows:

> In Moore, the apparent conflict directly corresponded to a specific RFC limitation, namely reaching. The same is true for Kemp v. Colvin, 743 F.3d 630, 632-33 (8th Cir. 2014), upon which Moore relies for its apparent conflict analysis. In the present case, the alleged conflict does not directly correspond to a specific RFC limitation. Stated differently, Moore and Kemp involved apparent and actual conflicts between the RFC given to the VE and the DOT requirements relied upon. The present case, however, involves an apparent possible conflict at best. There was nothing obvious and even Plaintiff's counsel did not question the VE at all. A contrary conclusion would be largely unworkable at the administrative level. Furthermore, a contrary conclusion would also tend to undermine the deferential standard of judicial review by permitting disappointed claimants to scan the DOT/SCO for any possible conflict, however small, and thereby short circuit the substantial deference normally accorded to the Commissioner's disability determinations.

> Id. at *18 (internal footnote omitted).

In this case, the ALJ relied on interrogatory responses from a VE at step five to find there were a number of jobs in the national economy that Plaintiff could do, including bench assembler listed as DOT 706.684-042 and a laundry worker listed as DOT 302.685-010, both with a

specific vocational preparation of level 2 and classified in the DOT as light and unskilled.[12]  The VE responded yes to the question asking if his testimony was consistent with the DOT and the SCO.  In her written decision, the ALJ found that the VE's testimony was consistent with the information in the DOT.

In the instant case, one of the limitations included in Plaintiff's RFC is not mentioned by DOT and SCO descriptions.  The DTO and SCO descriptions for laundry worker and bench assembler are generally silent as to change in work location.  "The DOT's silence on a given limitation does not normally create a conflict between a vocational expert's testimony and the DOT…."  Stamper v. Colvin, 174 F.Supp.3d 1058, 1065 (E.D. Mo. 2016); Bradford v. Colvin, 2016 WL 1048980, at * 8 (E.D. Mo. Mar. 11, 2016) ("The DOT does not address operating foot controls and exposure to dog and cat dander.  Therefore, no conflict exists as to these issues."); McCallister v. Astrue, 2012 WL 4357878, at *9 (E.D. Mo. Sept. 24, 2012) (finding no conflict between the DOT and the vocational expert's testimony where the DOT was silent as to a particular limitation).  Accordingly, the undersigned is satisfied that this limitation, even if not explicitly mentioned in the DOT definitions of the VE's proffered occupations, does not create a

_____

[12] The DOT explains that the fifth digit of a particular listing's numerical code "expresses the worker's relationship to people in a particular job."  Department of Labor, Parts of the Occupational Definition (1991), available at www.aolj.dol.gov/public/dot/references/dotparts.htm.  "As a general rule, Worker Functions involving more complex responsibility and judgment are assigned lower numbers … while functions which are less complicated have higher numbers."  Id.  Here each of the relevant occupations is assigned an 8 – the highest number and thus, the lowest level of relating with people. Id.  The DOT describes this level as "[a]ttending to the work assignment instructions or orders of supervisor.  (No immediate response required unless clarification of instructions or orders is needed)."  Department of Labor, Dictionary of Occupational Titles, Appendix B (1991), available at www.aolj.dol.gov/public/dot/references/dotappb.htm.  The DOT explains that social interaction is "not significant" in unskilled jobs identified by the VE.  Thus, both of the positions identified by the VE are characterized as involving the lowest level of interaction with people assigned in the DOT – limited to "taking instructions – helping" and each is rated as "performing repetitive or short cycle work."  See DOT 302.685-010 and 706.684-042.

conflict between the VE's testimony and the DOT.  Id.  To the extent that Plaintiff is suggesting

that remand is required because the RFC contains some limitations not described in the DOT, the

Court does not find it to be a basis for remand.

The occasional interaction with supervisors and coworkers and the incidental interaction

limitations with public limitations require further analysis.

### 1.     Bench Assembler

Under DOT 706.684-042, a bench assembler is defined as having a reasoning level of 2

and requires an individual to assemble parts "to form yard and garden care equipment

components…."  DOT 706.684-042.  The specific job requirements listed in the DOT for a

bench assembler do not include interaction with coworkers, and Plaintiff is not actually required

to interact with other workers or the public.  The DOT explains that social interaction is "not

significant" for this job and is rated at a Level 8.  Level 8 interaction requires:  "Taking

Instructions – Helping:  Attending to work assignment instructions or orders of supervisor.  (No

immediate response required unless clarification of instructions or orders is needed).  Helping

applies to 'non-learning' helpers."  DOT, Appendix B, 1991 WL 688701.  The designated level

of interaction is compatible with limiting a claimant to only occasional contact with coworkers,

supervisors, and the public.  See, e.g., Arsenault v. Astrue, 2009 WL 982225, at *3 (D. Me.

2009) (level of interaction denoted as "not significant" in DOT compatible with limitation to no

significant or no more than occasional interaction with public, coworkers, and supervisors).

Level 8 interaction is compatible with a RFC limiting a claimant to only superficial contact with

coworkers, supervisors, and the public.  See, e.g., Flaherty v. Halter, 182 F.Supp.2 824, 850-51

(D. Minn. 2001).  Thus, there is no discrepancy between the ALJ's RFC finding and the

occupation of bench assembler and no conflict with the DOT.

### 2. **Laundry Worker**

Under DOT 302.685-010, a laundry worker operates automatic washing and drying machines to clean and dry household articles, using a hand iron; sorts articles by color and fabric, and loads into automatic washing machine; adjusts machine settings for temperature, water level, and time duration of wash; adds measured amounts of detergent, bluing, starches, and fabric softener as required; and removes articles from washer and loads into dryer. DOT 302.685-010. The worker also sorts, irons, and folds dried articles and may perform other housework. Id.

The DOT description of a laundry worker shows any interaction required of a claimant with coworkers or the public would only be incidental to his primary task of tending to washing and drying machines, which would not require interaction with coworkers or the public. The DOT description of a laundry worker's duties includes numerous other tasks that do not require interaction with others, including sorting, ironing, and folding laundry; adjusting machine settings; and measuring detergent, starches, and fabric softener. This position is characterized as involving the lowest level of interaction with people assigned in the DOT and rated as performing repetitive or short cycle work. DOT 302.685-010, 1991 WL 672657. A review of the DOT listing reveals that Plaintiff would be able to perform the position of laundry worker. The description of laundry worker demonstrates that the level of interaction required for such work does not exceed his RFC limitation or conflict with the DOT. Accordingly, the undersigned finds that the ALJ properly relied on the VE's testimony, and her finding that Plaintiff can perform work existing in significant numbers in the national economy is supported by substantial evidence.

In the alternative, the undersigned finds that the ALJ's letter to Plaintiff's counsel made clear that, counsel had the opportunity to submit additional evidence to the VE, submit legal

argument, or provide written questions to the expert. Counsel only raised the alleged conflict

between the limitation in the RFC as to the ability to "understand, remember and carry out

simple instructions" and the ability to perform jobs with a DOT reasoning level of 2. Because

Plaintiff's counsel did not raise this alleged conflict between the VE's opinion and the DOT

description when given the opportunity to do so,[13] the ALJ was entitled to accept and rely upon

the VE's testimony. See Overman v. Astrue, 546 F.3d 456, 463 (7th Cir. 2008) (the Seventh

Circuit explained that claimant's counsel's failure to identify the relevant conflicts between the

VE's testimony and the DOT, at the time of the hearing, "is not without consequence.

[Claimant] now has to argue that the conflicts were obvious enough that the ALJ should have

picked up on them without any assistance, for SSR 00-4p requires only that the ALJ investigate

and resolve apparent conflicts ...."). As explained by this Court in an earlier decision, "[a]

contrary conclusion would be largely unworkable at the administrative level. Furthermore, a

contrary conclusion would also tend to undermine the deferential standard of judicial review by

permitting disappointed claimants to scan the DOT/SCO for any possible conflict, however

small, and thereby short circuit the substantial deference normally accorded to the

Commissioner's disability determinations." Latragna, 2015 WL 4771630, at *18.

**VIII. Conclusion**

    For the foregoing reasons, the Court finds that the ALJ's determination is supported by

---

[13] The present case involves an apparent possible conflict at best. There was nothing obvious
and even Plaintiff's counsel did not submit written questions to the VE when given the
opportunity. Inasmuch as the alleged conflict between the DOT and the social interaction
requirements for the bench assembler and laundry workers jobs were not apparent, the ALJ was
not required to make findings beyond accepting the VE's testimony. Cf. SSR 00-4p, 2000 WL
1898704, at *2 ("When there is an apparent unresolved conflict between [VE] evidence and the
DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the
[VE] evidence to support a determination or decision about whether the claimant is disabled.").

substantial evidence on the record as a whole.  See <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir.

2008).  Similarly, the Court cannot say that the ALJ's determinations in this regard fall outside

the available "zone of choice," defined by the record in this case.  See <u>Buckner v. Astrue</u>, 646

F.3d 549, 556 (8th Cir. 2011).  For the reasons set forth above, the Commissioner's decision

denying benefits is affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

/s/ *John M. Bodenhausen*
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of June, 2017.